## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **MICHAEL HARRIS (N03870),** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **DR. PARTHA GHOSH, in his individual capacity as Medical Director of SCC; MICHAEL P. RANDLE, in his individual capacity as Director of IDOC; SARAH JOHNSON, in her individual capacity as ARB Coordinator; MARCUS HARDY, in his individual capacity as Warden of SCC; TERRY L. McCANN, in his individual capacity as Warden; Dr. LIPING ZHANG, in her individual capacity as Staff Physician; EVARISTO AGUINALDO, in his individual capacity as Staff Physician; MARK HOSEY, in his individual capacity as Assistant Warden of Programs; ALLAN KARRAKER, in his individual capacity as Wexford Regional Administrator; MARVIN REED, in his individual capacity as Assistant Warden of Programs; ANTHONY RAMOS, in his individual capacity as Acting Warden; CHRIS CANNON, in his individual capacity as counselor; and MARGARET THOMPSON, in her individual capacity as grievance officer,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **No. 10 C 7136** ) ) **Judge Rebecca R. Pallmeyer** ) ) ) ) ) ) ) ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Harris, a prisoner at the Stateville Correctional Center, has brought this *pro se* suit pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to his serious medical needs resulting from diabetes. Defendants have moved for summary judgment, arguing that the undisputed facts show that several of the named Defendants were not responsible for Plaintiff's medical care at all, and that there is no evidence of deliberate indifference on the part of those who were responsible for that care. For the reasons explained here, the motions for summary judgment are granted.

# FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiff has been incarcerated at the Stateville Correctional Center ("Stateville") since 1987 when he was convicted of attempted murder. (Wexford Defs.' Local Rule 56.1(a) Statement of Material Facts (hereinafter "Wexford Defs.' 56.1") [77] ¶¶ 8, 10.) Now 52 years old, Plaintiff is 6'1" tall and weighs 227 pounds. (Wexford Defs.' 56.1 ¶ 9; Harris Dep., Ex. C to Wexford Defs.' Exs. in Supp. of Summ. J. [80, 81], 106:11-14.) Plaintiff was diagnosed with Type 1 diabetes in 1992 and with high blood pressure in 2000. (Wexford Defs.' 56.1 ¶ 7; Harris Dep. 64:6-10.)

In 2007, Plaintiff suffered a heart attack and underwent surgery. (Harris Dep. at 11:1-11, 62:2-3.) Plaintiff admits that there is no evidence that the heart attack resulted from diabetes, (Harris Dep. at 11:1-11, 82:7-17), but he asserts that his heart condition "was misdiagnosed three times" by Dr. Partha Ghosh, Dr. Edward Aguinaldo, and by physician assistant LaTonya Williams.[2] (Harris Dep. 11:15-12:13.) Plaintiff also testified that, "in the middle of [20]10," he experienced pain in his eye and underwent corrective surgery. (Harris Dep. 13:14-24, 15:14-24.) Plaintiff testified that he had "floaters that . . . were bursting in the back of [his] eyes[,] interfering with [his] vision . . . ." (Harris Dep. 14:2-6.) In an eye check-up six months after the surgery, Dr. Ghosh said he wanted to monitor the health of Plaintiff's other eye; as of August 8, 2011, when Plaintiff gave his deposition, however, Plaintiff had not yet been back for another eye exam. (Harris Dep. 16:23-17:5.)

Plaintiff also suffers from pain in his legs, arms, and feet, which he attributes to diabetic neuropathy or nerve damage resulting from high blood sugar levels. (Harris Dep. at 9:16-10:5.)

---

[1] These facts are drawn from the record and are presented in the light most favorable to Plaintiff, the non-moving party. *Rosario v. Brown*, 670 F.3d 816, 820 (7th Cir. 2012). As required by Local Rule 56.1(a), Defendants have submitted statements of the facts that they contend are not in dispute, and the court relies upon those statements to the extent that they are supported by the record. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Although Plaintiff was technically tardy in filing his Local Rule 56.1 response, the court has reviewed those materials consistent with its obligation to construe liberally *pro se* pleadings. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

[2] LaTonya Williams is not a named defendant.

Asked how he knew the pain was caused by neuropathy, Plaintiff explained that he had "asked several physicians that work here and have worked here. And I also subscribe to the American Diabetic Association and in the information they explain a lot of these things to you, what the symptoms are and the pain and what caused it." (Harris Dep. 10:9-18.)

The record demonstrates that Plaintiff is conscientious and knowledgeable about his diabetes. He attempts to keep his weight at 224 to 227 pounds—a task that he describes as a "constant struggle" and that requires him to check his weight every other day. (Harris Dep. 107:9-14.) Getting sufficient exercise is not an issue for him; he enjoys walking, running, and boxing. (Harris Dep. 107:15-20.) Plaintiff works hard to take care of himself because he knows that diabetes raises his risk of heart attack, stroke, blindness, and limb amputation. (Harris Dep. 11:15-19, 21:13-18.)

By his own account, Plaintiff has been able to maintain a reasonably healthy diet while incarcerated. He has a prison job as a cook where he prepares inmate meals every day from 5:00 a.m. to 1:00 p.m. (Harris Dep. 107:24-108:16.) The job allows Plaintiff "certain privileges that other inmates with diabetes are not afforded," namely access to heathier low-sodium, low-fat food like salads with chicken or turkey. (Harris Dep. 108:4-9.) He eats breakfast at work by 6:30 a.m. and then has a light lunch around noon. (Harris Dep. 108:18-20.) After work, he receives a snack bag around 3:00 p.m. that usually contains cheese, crackers, and juice. (Harris Dep. 30:22-24, 109:13-15.) At 6:30 or 7:00 p.m., Plaintiff takes his evening meal, a diet consistent with cardiac needs, free of eggs, hot dogs, cold cuts, sausage, gravy or other high fat foods. (Harris Dep. 30:10-15; 109:4-7.)

The Illinois Department of Corrections ("IDOC") has granted Plaintiff several other privileges in order to accommodate his diabetes. He is allowed to have food—such as peanut butter crackers, a sandwich, or candy—with him at all times, so that he can raise his blood sugar as necessary. (Harris Dep. 109:22-110:10.) He is allowed to wear a pressure cuff to help with blood

circulation. (Harris Dep. 77:3-4.) Plaintiff is housed in a cell on a low gallery and assigned a bottom bunk as a protective measure, should he black out from an insulin reaction. (Harris Dep. 77:6-11.) He also has permission to wear special, soft leather shoes. (Harris Dep. 77:12-13.)

Plaintiff receives Glucophage, a prescription medication, to treat his diabetes, and a number of other medications to treat his high blood pressure and heart disease. (Harris Dep. 62:10-63:17.) Three to four times a year, Plaintiff visits a diabetes clinic conducted by the medical staff at Stateville. (Harris Dep. 98:17-99:12.) During a clinic visit, the medical professionals check his weight, take his blood pressure and temperature, conduct blood tests, and discuss his eating and exercise habits with him. (Harris Dep. 98:17-100:17.) The clinic visits provide Plaintiff with an opportunity to speak with the medical staff about his problems and report "how [his] body has been doing over the last [four] months." (Harris Dep. 99:20-24.) In addition to the information provided at the clinic, Plaintiff has learned about diabetes from other sources, such as the physicians working at Stateville and the American Diabetic Association. (Harris Dep. 10:13-18).

Plaintiff's primary challenge to the adequacy of his care is his claim that his twice-daily insulin shots are distributed irregularly. (Harris Dep. 62:13-15.) He administers the injections himself in the presence of the medical technicians who deliver the insulin to him. (Harris Dep. 71:2-5.) Typically, he receives his first insulin shot at 6:00 a.m when he is working in the kitchen. (Harris Dep. 108:18-19.) The delivery time for the second injection is particularly inconsistent; Plaintiff testified that the medical technicians sometimes deliver it between 4:00 p.m. and 5:00 p.m., but that on other days, they arrive as late as 10:30 p.m. or 11:00 p.m. (Harris Dep. 24:5-9.) He explained that this irregularity can cause "serious complications" where one dose of insulin "runs into" another dose. (Harris Dep. 24:5-14.) The timing of the insulin injections is most irregular when the prison is on "lockdown," which is not uncommon and can sometimes last for days or even months. (Harris Dep. 94:1-95:1.)

Plaintiff also expressed concern about his lack of regular access to a glucometer machine

4

to test his blood sugar levels. Sometimes the medical technicians who deliver the insulin have a glucometer with them, but at other times, they do not. (Harris Dep. 23:17-24.) Plaintiff recalled that, in 1995, when a different warden managed Stateville, he was able to keep a glucometer machine in his cell, but he is no longer allowed to do so. (Harris Dep. 24:1-4.) According to Plaintiff, the irregular delivery of insulin combined with the inconsistent access to a glucometer machine could cause a dangerous drop in his blood sugar—he described it as "playing Russian roulette." (Harris Dep. 25:17-27:4.) When his blood sugar is too low, Plaintiff becomes irritable and has what he describes as "a fit"; he can even become violent, cursing and throwing items at people. (Harris Dep. 24:21-25:5; 31:14-21.) Plaintiff noted that very low blood sugar can cause seizures, though he admits he has never had one. (Harris Dep. 24:8-14, 31:7-11.)

Plaintiff also complained about the fact that Stateville no longer maintains a dietician or a podiatrist on its medical staff. He testified that he learned "what foods to avoid and what types of foods [a diabetic] should eat" from a dietician employed at the prison during some earlier period, and noted that having a dietician on staff would help the prison to provide a healthy meal plan for diabetics and monitor their consumption, thus reducing risks. (Harris Dep. 85:14-18; 90:7-92:5.) Plaintiff also stated that Stateville had four or five podiatrists on staff when he entered in 1987 and that he kept regular appointments with them until 2006, when Stateville stopped providing podiatry services. (Harris Dep. 65:11-13, 66:3-4.) During those appointments, the podiatrist typically checked Plaintiff's feet for diabetes-induced ulcers and neuropathy. (Harris Dep. 67:22-68:06.) Plaintiff has never had any ulcers or pressure sores on his feet, but he knows that he could experience these conditions from having read about them in diabetes education magazines. (Harris Dep. 68:4-9.)

Before filing this suit, Plaintiff filed several grievances at Stateville. On September 11, 2009, he filed an emergency grievance with Stateville's Chief Administrative Officer at the time, Marcus Hardy, to protest the irregular delivery of his insulin. (Compl. ¶ 28; *see also* Sept. 11, 2009

5

Offender's Grievance, part of Ex. C to Pl.'s Exs. in Opp'n to Defs.' Mot. for Summ. J. [90], at 1.) In the same grievance, Plaintiff complained about the alleged misdiagnosis of his 2007 heart attack, pain in his abdomen at an insulin injection site, and the lack of access to a podiatrist. (Sept. 11, 2009 Grievance at 1-3.) On October 28, 2009, Plaintiff's counselor, Chris Cannon, reviewed the complaint. Cannon responded that Plaintiff visits the diabetes clinic every three months (his last visit was just a week earlier, on September 4, 2009), and that the "[i]nsulin is delivered as close to a schedule as possible, but other events may prevent timely delivery." (Sept. 11, 2009 Grievance at 1.) It appears that no further action was taken.

In response, Plaintiff filed at least one emergency grievance,[3] which underwent several rounds of review. In his October 30, 2009 grievance, Plaintiff challenged Cannon's determination that Plaintiff was receiving adequate medical care and the procedure by which his September 11, 2009 grievance had been reviewed. (Oct. 30, 2009 Offender's Grievance, part of Ex. C to Pl.'s Exs., at 1.) Grievance Officer Margaret Thompson reviewed the claim and, on December 30, 2009, issued a statement in which she found no error in Cannon's procedure and affirmed his decision. (Resp. to Committed Person's Grievance, part of Ex. C to Pl.'s Exs., at 1.) Thompson also noted that Plaintiff could discuss his injection site pain at the diabetes clinic and that he could be referred to a podiatrist. (*Id.*) She concluded that "[n]o further action [was] necessary." (*Id.*) Two weeks later, on January 14, 2010, the Chief Administrative Officer approved Thompson's report.[4] (*Id.*) Plaintiff then sought further review with the IDOC Administrative Review Board; on

---

[3] The complaint states that Plaintiff filed two emergency grievances on October 22 and 26, 2009 (Compl. ¶ 29), but the record contains only one emergency grievance dated on October 30, 2009. (*See* Oct. 30, 2009 Offender's Grievance, part of Ex. C to Pl.'s Exs.)

[4] The identity of the Chief Administrative Officer who approved Thompson's report is not clear from the pleadings. In his complaint, Plaintiff initially names Marcus Hardy as the Chief Administrative Officer (Compl. ¶ 28), but later refers to Marvin Reed as the "Chief Administrator of Stateville." (Compl. ¶ 37.) In Plaintiff's October 30, 2009 grievance, however, he names Anthony Ramos as the Chief Administrative Officer and the Acting Warden. (*See* Oct. 30, 2009 Offender's (continued...)

May 4, 2010, Sarah Johnson, the Board Chair, sent Plaintiff a letter stating that Plaintiff's grievance had been "appropriately addressed by the institutional administration." (May 4, 2010 Letter, part of Ex. C to Pl.'s Exs., at 1.) IDOC Director Michael Randle also signed Johnson's letter. (*Id.*)

At the same time that Plaintiff was filing formal grievances, he also initiated a letter-writing campaign, preparing letters in which he described the alleged deficiencies in his medical care. Plaintiff sent his letters to Michael Randle, IDOC Director[5]; Allan Karraker, Wexford Regional Administrator; Terry McCann, Stateville Warden; Marvin Reed, Stateville Assistant Warden; Mark Hosey, Stateville Assistant Warden, and Anthony Ramos, Stateville Assistant Warden. (Compl. ¶ 35, 37, 41, 51.) According to Plaintiff, none of the letter recipients took action to improve his medical care.

In his complaint, Plaintiff names thirteen Defendants, who will be considered in two groups for purposes of these motions for summary judgment. Defendants Drs. Partha Ghosh, Liping Zhang, and Edward Aguinaldo ("Medical Defendants") are physicians, employed by Wexford Health Sources, Inc. ("Wexford"), who provided or supervised Plaintiff's medical care at Stateville. The other ten individuals ("Nonmedical Defendants") are officers to whom Plaintiff directed a complaint about his medical care, either by letter or by the formal grievance process; nine are various IDOC employees and the tenth is Defendant Allan Karraker, the Wexford regional administrator. Notably, the medical technicians who deliver the insulin shots are not named as Defendants.[6]

---

[4](...continued)
Grievance.) Defendants' filings do not specifically identify who served as Chief Administrative Officer in January 2010 or who approved Thompson's report; the signature on the report is illegible.

[5] Plaintiff's complaint misspells the IDOC Director's name as "Michael Randall."

[6] Defendants filed two motions for summary judgment; the IDOC Defendants filed one motion and the Wexford Defendants filed another. (*See* Defs.' Mot. for Summ. J. [83]; Defs.' Mot. for Summ. J. [75].) For purposes of its legal analysis, however, the court has divided Defendants into two slightly different groups—Medical Defendants and Nonmedical Defendants. Thus, Allan Karraker, a Wexford administrator who moved for summary judgment with the Medical Defendants,
(continued...)

**DISCUSSION**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2011). The court may not weigh conflicting evidence or make credibility determinations; it must view all admissible evidence in the light most favorable to and draw all inferences in favor of the nonmoving party. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Defendants, as the moving party, have the initial burden of showing there is no genuine dispute of material fact, and they are entitled to judgment as a matter of law. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If Defendants meet this burden, Plaintiff must respond with specific facts demonstrating that there is, indeed, a genuine dispute that must be adjudicated at trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *Rosario*, 670 F.3d at 820 (internal quotation marks and citation omitted).

**I.  Deliberate Indifference**

"The Eighth Amendment's prohibition against cruel and unusual punishment requires that prison officials 'take reasonable measures to guarantee the safety of the inmates.'" *Santiago v. Walls*, 599 F.3d 749, 758 (7th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). An official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" in violation of the Eighth Amendment. *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To succeed on a deliberate indifference claim, Plaintiff must prove (1) that he suffers from an objectively serious medical need or condition (2) to which Defendants were intentionally

---

[6](...continued)
will be treated as a Nonmedical Defendant along with the IDOC Defendants.

indifferent—negligence, even gross negligence, or medical malpractice, is not sufficient to establish such a claim. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "And though deliberate means more than negligent, it is something less than purposeful." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). An official exhibits "deliberate indifference" where he or she "knows of and disregards an excessive risk to inmate health or safety," or, in other words, where the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] . . . draw[s] the inference." *Farmer*, 511 U.S. at 832.

Plaintiff's diabetes satisfies the first element, because it is a serious medical condition that was previously "diagnosed by a physician as mandating treatment . . . ." *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008) (citation omitted); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 532 (7th Cir. 2011) (identifying diabetes as a "serious medical condition[]" for purposes of a deliberate indifference claim under § 1983). The fact that serious risks have not materialized does not defeat Plaintiff's claims because "the Eighth Amendment 'protects an inmate not only from deliberate indifference to his or her current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to future health.'" *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (quoting *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005)) (emphasis omitted).

## II.  Medical Defendants

In determining whether Defendants knew of and intentionally disregarded an "excessive risk" to Plaintiff's health, the court turns, first, to the claims against the Medical Defendants. A "'medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.'" *Roe*, 631 F.3d at 857 (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). To constitute deliberate indifference, the medical professional's challenged treatment decision must be "'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person

9

responsible did not base the decision on such a judgment.'" *Gayton v. McCoy*, 593 F.3d 610, 622-23 (7th Cir. 2010) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)).

Plaintiff's claim of deliberate indifference is based primarily on the irregular delivery of his insulin and the inability to routinely check his blood sugar levels with a glucometer. In evaluating this claim, the court notes, first, that Plaintiff has not named as Defendants any of the medical technicians who deliver his insulin. Liability under § 1983 is premised on a defendant's "personal responsibility" for the misconduct, *Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012), yet Plaintiff failed to name the individuals who arguably bear the most personal responsibility for the inconsistent delivery of his insulin. "An *individual* cannot beheld liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Id.* (internal quotations marks and citations omitted) (emphasis in original).

Instead of naming the medical technicians who would appear to have "caused or participated in" the circumstances leading to the irregular delivery of his insulin, Plaintiff has sued Drs. Ghosh, Zhang, and Aguinaldo for their alleged failure to supervise the medical personnel that treated him. Thus, Plaintiff's complaint alleges that Dr. Ghosh "deprived him of a serious medical need by failing to have his medical staff . . . adhere to the procedures and criteria . . . regarding diabetes and the proper care of diabetic patients." (Compl. ¶ 45.) He states also that Dr. Ghosh ignored his requests for daily blood sugar level checks and denied him the necessary services of a podiatrist and a dietician. (Compl. ¶¶ 46, 47.) With respect to Drs. Zhang and Aguinaldo, Plaintiff states simply that they are both staff physicians who denied him access to regular blood sugar level checks, a podiatrist, and a dietician. (Compl. ¶¶ 11, 12, 49, 50.) Plaintiff does not describe any conversations or communications he has had with any of the Medical Defendants concerning his medical care or explain how any of the Medical Defendants are personally responsible for the inadequate care he claims to be receiving. The Medical Defendants' alleged failure to supervise the technicians is not by itself a basis for liability; agency principles of *respondeat superior* and

vicarious liability do not apply to § 1983 claims. *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008) (citing *Monell v. N.Y. City Dep't Soc. Servs.*, 436 U.S. 658, 691 (1978)).

Even assuming that Plaintiff had named the appropriate Defendants, his claim has little merit. There is no basis in the record for the conclusion that Plaintiff is receiving inadequate care. He manages his diabetes with twice daily insulin injections, a healthy diet, and plenty of exercise. (Harris Dep. 62:13-15, 107:15-20, 108:4-9.) He also takes Glucophage, a prescription medication, to treat his diabetes. (Harris Dep. 62:10-63:17.) Prison officials allow Plaintiff to keep snacks with him at all times, in order to raise his blood sugar as necessary. (Harris Dep. 109:11-110:10.) He wears a pressure cuff and soft leather shoes to treat some of the symptoms of diabetes. (Harris Dep. 77:3-13.) As a protective measure, he is assigned a low bunk in a cell on a low gallery, just in case an insulin reaction causes him to lose consciousness. (*Id.*) Finally, three to four times a year, Plaintiff visits a diabetes clinic in which Stateville medical staff check his vital signs and discuss his diabetes management program with him, including diet and exercise. (Harris Dep. 98:17-99:24.)

Plaintiff contends that, despite these accommodations, the medical attention he receives does not meet the standards prescribed by the American Diabetes Association, which recommends annual comprehensive foot exams and nutrition counseling by a registered dietician. (Compl. ¶ 21.) He also insists that he should be able to check his blood sugar with a glucometer before administering his insulin injections, every twelve hours, in order to prevent the onset of a low blood sugar-induced "fit." (Harris Dep. 24:21-25:5.) The Constitution, however, does not require that Plaintiff receive "'unqualified access to health care'" or the best care possible. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). To the contrary, the Eighth Amendment requires only the provision of "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002) (citing *Estelle*, 429 U.S. at 103.)

The fact that Plaintiff's care is adequate, if not ample, is demonstrated by his ability to

successfully regulate his diabetes with relatively few side effects for 20 years. He has not suffered diabetes-related strokes, blindness, limb amputation, or ulcers. Plaintiff did have a heart attack in 2007, but he has not suggested that inadequate diabetes treatment was the cause. And he underwent surgery to implant stents as a result of the heart attack. (Harris Dep. 11:1-11, 62:2-3.) The court sympathizes with Plaintiff's frustration stemming from the inconsistent delivery of insulin and his unreliable access to a glucometer, but these relatively minor deficiencies have not exposed Plaintiff to "excessive risk." "[T]he Constitution is not a medical code that mandates specific medical treatment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). Plaintiff has failed to demonstrate that any shortcomings in his medical care were either "blatantly inappropriate" or motivated by something other than sound medical judgment. *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012). For these reasons, Plaintiff has not shown that the Medical Defendants' treatment constituted deliberate indifference. The court, therefore, grants the Medical Defendants' motion for summary judgment.

### III.     Nonmedical Defendants

Plaintiffs' claims against the Nonmedical Defendants appear to be based on two alternative theories of liability; both theories lack merit. First, Plaintiff seeks to impose liability based upon Defendants' supervisory positions in the prison or within IDOC. (*See, e.g.*, Compl. ¶ 7) (alleging that IDOC Director Michael Randle "is responsible for conditions and operations at Stateville"). But, as the court already stated, the theory of *respondeat superior* does not support a claim for relief under § 1983. *Sanville v. McCaughtry*, 266 F.3d 725, 740 (7th Cir. 2001). In order to hold a supervisor liable for the actions of his or her subordinates under § 1983, "[t]he supervisors must know about the [mis]conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (internal quotation marks and citations omitted).

Plaintiff's second theory is that the Nonmedical Defendants knew about the allegedly

12

inadequate medical care and chose to ignore it. Plaintiff either wrote a letter or filed a formal grievance with each of the Nonmedical Defendants that, he claims, put them on notice of an excessive risk to his health. When they failed to intervene, Plaintiff argues, the Nonmedical Defendants effectively "turn[ed] a blind eye" to the alleged shortcomings in his medical care, thereby demonstrating deliberate indifference. (*See, e.g.*, Compl. ¶ 51) (stating that Chief Administrative Officer Ramos "tended to 'turn a blind eye' toward[] Plaintiff's plight").

Nonmedical Defendants, however, are entitled to defer to the judgment of treating medical professionals unless the decision to afford deference, in itself, exhibits deliberate indifference. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (stating that deliberate indifference would exist where a complaint examiner "sent each grievance to the shredder without reading it" or "intervened to prevent the medical unit from delivering needed care"). In *Burks*, the Seventh Circuit roundly rejected another prisoner's attempt to hold various nonmedical officers responsible for the alleged deficiencies in his medical care:

> The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. [Plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care.

*Burks*, 555 F.3d at 595 (Easterbrook, J.) (citations omitted). The *Burks* court upheld dismissal of a § 1983 claim against a complaint examiner on the basis that she bore no personal responsibility for the medical unit's inaction after the unit received her memo directing that Plaintiff have an eye examination. *Id.* at 595-96. The court stated, further, that "[a] layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service." *Id.* at 596.

13

Similarly, Plaintiff cannot demand that the Nonmedical Defendants "drop everything . . . to investigate [his] claims." Notably, in this case the record shows that those officers who had an obligation to address Plaintiff's concerns in fact did so. When Plaintiff filed his September 11, 2009 grievance, his counselor, Chris Cannon, reviewed it, noted that Plaintiff regularly attends the prison's diabetes clinic, and that "other events may prevent timely delivery" of Plaintiff's insulin. (Sept. 11, 2009 Grievance at 1.) In conducting his review, Cannon reasonably relied on the medical staff to administer Plaintiff's insulin as consistently as possible within the realistic constrains of prison operations. When Plaintiff appealed to a higher level officer, grievance counselor Margaret Thompson also reviewed and responded to his concerns; she too noted Plaintiff's access to the diabetes clinic and stated, further, that Plaintiff could be referred to a podiatrist. (Resp. to Committed Person's Grievance at 1.) Her decision was also reviewed and affirmed by the Chief Administrative Officer at the time. (*Id.*) Finally, Sarah Johnson of IDOC's Administrative Review Board evaluated Plaintiff's grievance and deemed it "appropriately addressed by the institutional administration." (May 4, 2010 Letter at 1.) There is no evidence that any officer who reviewed Plaintiff's grievances entirely disregarded his concerns or discouraged the medical staff from consistently delivering his insulin. With respect to the recipients of Plaintiff's letters, as the *Burks* court made clear, they were "entitled to relegate to the prison's medical staff the provision of good medical care." Plaintiff cannot impose liability for his allegedly inadequate medical care upon any public official who ever received a complaint letter from him.

Finally, as the court already explained, Plaintiff has not demonstrated that he actually faced an "excessive risk." There must be evidence that the Nonmedical Defendants "knowingly exposed [Plaintiff] to a substantial danger to his health for no good reason. *Compare Egebergh v. Nicholson*, 272 F.3d 925, 927 (7th Cir. 2001) (finding that a jury could infer deliberate indifference where the defendant officers denied a diabetic prisoner his morning insulin shot in order to take him to court, causing the prisoner's death later that evening). Plaintiff has not shown that the Nonmedical

Defendants acted with deliberate indifference to his serious medical needs.  The court enters summary judgment in favor of the Nonmedical Defendants, as well.

## **CONCLUSION**

For the reasons explained herein, the court grants Defendants' motions for summary judgment [75, 83].  Plaintiff's third motion for appointment of counsel [88] and his motion for a physical examination [101] are denied.

ENTER:

Dated:  September 7, 2012

_____
REBECCA R. PALLMEYER
UNITED STATES DISTRICT JUDGE